# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### TAMPA DIVISION

**JOHN STEPHENS,**

      **Plaintiff,**

**v.**                                     **Case No.  8:06-cv-2299-T-30MSS**

**LOUISVILLE LADDER, INC. et al,**

      **Defendants.**

_____/

## <u>ORDER</u>

THIS CAUSE comes before the Court upon Defendants Louisville Ladder, Inc. and Wal-Mart Stores, Inc.'s Motion for Summary Judgment and Supporting Memorandum of Law (Dkt. #41), Defendants' Notice of Evidentiary Submissions in support of Motion for Summary Judgment (Dkt. #42), Plaintiff's Memorandum in Opposition to Defendants Motion for Summary Judgment (Dkt. #44), and Plaintiff's Notice of filing evidentiary submissions in opposition to Defendants' Motion for Summary Judgment (Dkt. #45). The Court, having considered the motion, response, affidavits, depositions, exhibits, and being otherwise advised in the premises, concludes that Defendants' motion for summary judgment should be denied.

### Background.

On October 2, 2002, Plaintiff John Stephens ("Plaintiff" or "Stephens") was found by several people (a secretary, contractor and co-worker) lying unconscious near a broken

ladder beneath an opening where ceiling tiles had been removed.[1]   At the time of the accident, Plaintiff was working for an air-conditioning company installing duct-work.  As a result of the severity of Plaintiff's head injuries, he has no personal memory of the events leading up to his accident.  Plaintiff was alone in a room when the accident occurred. Further, at some point after Plaintiff's accident but prior to the filing of this action, the ladder at issue was destroyed by the construction company managing the construction project. Accordingly, the reconstruction of Plaintiff's accident is primarily based upon: a co-worker's statement of Plaintiff's activities immediately prior to the accident; the same co-worker's impressions upon finding Plaintiff's unconscious body lying near the broken ladder; the impressions of Plaintiff's boss who examined the scene of the accident after Plaintiff was transported to the hospital (thus did not have the benefit of seeing where Plaintiff's body was lying or whether debris was on top of him); photographs of the accident site and broken ladder; and the opinion of an expert.

The day after Plaintiff's accident, a co-worker named David Betts ("Betts") provided a witness statement to a claims consulting company regarding the circumstances surrounding Plaintiff's accident.  Betts stated, in pertinent part:

> I was working for Ocean Aire with John Stephens who was my helper.  He was working by himself in the site where he was injured.  We had been working in the area for about three days doing the ductwork.  He was working his way around, on the ladder.  He helped me for a few minutes getting a coil in the back room and then he went back to finish up his ductwork, and I was doing my work.

---

[1] Thus far, only the statement of the co-worker, David Betts, has been offered into the record. The statement is not under oath, but both parties have relied upon it.

Bob, the owner of the place, came out to me and said I had a worker laying down so I came to the room and that's when he just started coming to and that's when I saw blood running out of his ears, out of his nose, and out of his mouth and he got really irate and we had to hold him down because he did not know where he was.

Regarding the ladder, it is hard for me to say because I did not see him. I did not see the accident, I just saw where he was laying, I didn't see him standing on top of the ladder, I don't know how his head hit, I don't know if he hit forward or if he hit straight in the back. By the looks of the tile, it looks like the ladder gave and he tried to grab something and pulled all this stuff down with him. It is hard to say what happened because he was in there by himself. I didn't hear him yell, I was running torches, my drill and stuff and I didn't hear him yell for me.

* * *

John went into the room he was working in and he was working for about 20 minutes. I saw him walk by me and I didn't think anything about it and the next thing I heard was someone yelling for me. I came in and John was bleeding.

The distance from ceiling to floor is 10 feet, John was on an 8 foot ladder but he is 6'1" or 6'2" of slim build weighing approximately 160-170 at the most. I've never seen him stand on top of a ladder. He's tall and doesn't always need a ladder but we were working on ladders these past few days.

* * *

The way the ladder is broken is kind of fishy and weird and I think the ladder could be defective because I've never seen a ladder crack like that. The ladder was wooden and was a newer one. It was not my ladder. It looks like it broke just under the first row. They [Benderson Construction] won't let it go. We tried to get the ladder but they won't let it go.[2]

After Plaintiff was transported to the hospital, Plaintiff's boss, William Long, arrived at the scene of the accident. William Long's deposition taken over four (4) years after Plaintiff's accident states, in pertinent part:

Q:     What did you find when you went to the scene of the fall?

---

[2] Dkts. #45-8, Witness Statement Taken of David Betts on Thursday, October 3, 2002.

A:      There were some ceiling tiles open, and underneath it was the ladder that he had been on.

Q:      Who was that ladder owned by if you know?

A:      Benderson.

Q:      What was the condition of the ladder?

A:      It was broken probably about two feet up.

* * *

Q:      Do you recall seeing any blood stains on the floor or anything of that sort?

A:      I thought that there was some on the floor.

Q:      Do you recall where those blood stains were in relationship to the ladder?

A:      No.

* * *

Q:      What did Mr. Jarvis tell you about the accident?

A:      Well, he had told me that the secretary had come in and found our man, you know, laying on the floor.  Then, you know, they had called the ambulance to come and get him and then called me.  He had a secretary call me.  He had been there while they were waiting for the ambulance to get there.  Then he knew it was their ladder, so he kept the ladder.

Q:      Did he ever – did you ask him to give the ladder to you?

A:      No.  It wasn't mine.

Q:      Did he ever say they were going to keep the ladder to save, preserve the ladder or anything like that?

A:      Yes.  I had the broken piece of it, which I gave him back.

Q:      Did he ask you to give that back to him?

A:      Yes, he did.

Q:      Did he tell you why he wanted it back or give you any explanation?

A:      In construction, you know, you're always worried about lawsuits anyway.  I mean, they knew it was their ladder so I didn't have to ask.  I mean, I had worked for him for many years, you know, on many projects, so it was no reason to ask me - - to ask him why he wanted it back.

Q:      Did he tell you or you just assumed that he - you assume he wanted it back because there was a potential lawsuit?

A:      Correct.  Just like they were worried about Benderson being sued.

Q:      So it's your understanding that they wanted - asked for that piece of ladder back so that it could be preserved for a potential lawsuit?

A:      Yes, so they'd have everything that was theirs.  At that time they didn't know if he was going to live or not.

Q:      The injuries were pretty severe, or so you understand?

A: He was in a coma for quite awhile.

Q: Did Bill Jarvis provide any explanation to you as to how the accident happened?

A: No. He asked me what I thought.

Q: What did you tell him?

A: On the record?

Q: On the record.

A: From what I could see, and where John was working, it looked like he had overextended himself, reached out too far, kicked the ladder out from under him and landed on it, instead of moving the ladder to get under where he was working.

Q: Now, you reached that conclusion based on - once again, what did you reach that conclusion based on?

A: Where the duct work was, where the grill on the ceiling was and where the ladder was laying.[3]

* * *

Plaintiff's Complaint asserts strict liability and negligence claims against Defendants, Louisville Ladder, Inc. ("Louisville") and Wal-Mart Stores, Inc. ("Wal-Mart") (together, the "Defendants"). In the Complaint, Plaintiff alleges, in pertinent part, that: at the time the ladder was placed in the stream of commerce, the product was defectively designed or manufactured; the ladder was manufactured in such a manner that one or both of its legs could fracture during its normal and expected use; the defective condition rendered the ladder unfit and unsafe for its intended use in that the ladder had a propensity for one or more of its legs to fracture during the ladder's normal and expected operation; and such condition constituted a hidden latent defect for users of the ladder with the resulting likelihood that such persons would sustain serious injury or death during the product's normal, intended and proper use. Specifically, Plaintiff alleges that, on October 2, 2002: he was using the ladder

---

[3] Excerpts from Pages 15-19 of William Long's Deposition taken on August 21, 2007.

as intended; he was on the ladder doing duct work; while on the ladder, without warning, two of the ladders legs fractured causing Plaintiff to fall; he was severely injured as a result of the fall.

Plaintiff's expert, Dr. Monlin Kuo, a professor of wood science, has opined that the left rail failed because it was either dried too long or at too high of a temperature by the lumber company.[4] Mr. Kuo examined pictures of the broken ladder rails and compared the manner of the breaks with breaks from two other identical ladders that also failed (in two prior cases Dr. Kuo analyzed the broken ladders microscopically and found evidence of deterioration from high temperature drying).[5] Dr. Kuo also opined that because of the brashness of the break on the left rail it appears the left rail broke first and then the right rail splintered when Plaintiff's body fell on top of the collapsing ladder.[6]

Defendants' expert, Dr. Erick Knox, opined that: Plaintiff caused the ladder to tip over to the left side; Plaintiff then fell straight down on the ladder; and thus, the damage to the ladder was caused by the impact of Plaintiff's body falling on top of the ladder after the ladder tip-over started.[7]

---

[4] *See* Dkt. #42-3, Lines 16-21, Page 24 of Dr. Kuo's Deposition.

[5] *See* Dkt. #42-3, Pages 26 and 27 of Dr. Kuo's Deposition.

[6] *See* Dkt. #42-3, Page 37 of Dr. Kuo's Deposition.

[7] *See* Dkt. #42-9, Pages 67-69 of Dr. Knox's Deposition.

## Summary Judgment Standard.

Summary judgment is appropriate only where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "A genuine issue of material fact does not exist unless there is sufficient evidence favoring the nonmoving party for a reasonable jury to return a verdict in its favor." *Haves v. City of Miami*, 52 F.3d 918, 921 (11th Cir. 1995). At the summary judgment stage, the judge's function is not to "weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby*, 477 U.S. 242, 249 (1986).

In considering a motion for summary judgment, the court views all evidence in the light most favorable to the party opposing the motion. *Harris v. H & W Contracting Co.*, 102 F.3d 516, 519 (11th Cir. 1996). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. If the movant meets this burden, the burden then shifts to the nonmoving party to establish that a genuine dispute of material fact exists. *See Hairston v. Gainesville Sun Pub. Co.*, 9 F.3d 913, 918 (11th Cir. 1993).

## Analysis.

Defendants argue that they are entitled to judgment as a matter of law, because Plaintiff cannot prove the existence of a defect in the ladder. Further, Defendants argue that Plaintiff is not entitled to a *Cassisi* inference of a presumption of a manufacturing defect, since Plaintiff cannot personally testify that the ladder malfunctioned during normal use.

In response, Plaintiff argues that the evidence presented provides circumstantial evidence that Plaintiff was using the ladder in order to install ductwork at the time of his accident and that the photographs of the broken ladder illustrating the brashness of the breaks in the rails of the ladder provide evidence of a defect.

## I.     Negligence.

To establish negligence under Florida law, the plaintiff must prove: (1) a legal duty owed by the defendant to the plaintiff; (2) the defendant's breach of that duty, (3) an injury to the plaintiff legally caused by the defendant's breach, and (4) damages as a result of that injury. *IBP, Inc. v. Hady Enterprises, Inc.*, 267 F.Supp.2d 1148, 1159-60 (N.D. Fla. 2002). In Florida, "a legal duty will arise whenever a human endeavor creates a generalized and foreseeable risk of harming others." *McCain v. Fla. Power Corp.*, 593 So.2d 500, 503 (Fla. 1992).  In general, Plaintiff has alleged these elements in his complaint.

There is no question that Defendants owe a legal duty to Plaintiff to manufacture and sell ladders that are not defective.  Plaintiff has proffered expert opinion that the ladder was defective as well as lay opinion by David Betts stating "[t]he way the ladder is broken is kind of fishy and weird and I think the ladder could be defective because I've never seen a ladder crack like that.  The ladder was wooden and was a newer one."  Further, Plaintiff's expert, Dr. Kuo, has offered an opinion that the brashness of the break in the left rail of the ladder

tends to show that the wood was defective as a result of over-drying during the manufacturing process.[8]

Of course, Defendants oppose Dr. Kuo's opinion as to the brashness of the break, because such opinion is based primarily on photographs of the ladder pieces as well as the expert's experience and examination performed in two previous cases dealing with the same type of ladder. Instead, Defendants' expert contends that Plaintiff must have over-extended himself, lost his balance, and kicked the ladder out from under himself, causing himself to fall directly onto the ladder, breaking the rails of the ladder with his body.[9]

At the summary judgment stage, the Court's function is not to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial. Based on the conflicting opinions of experts and impressions of witnesses, the Court concludes that there is a material issue of fact as to the circumstances surrounding Plaintiff's fall and sufficient evidence favoring Plaintiff's version of the facts for a reasonable jury to return a verdict in his favor. Accordingly, the Court denies summary judgment as to the issue of negligence.

---

[8] Experts are permitted to testify based on inferences drawn from facts supplied by other witnesses. Section 90.704, *Fla. Stat.* (2006); *Fridovich v. State*, 489 So. 2d 143, 145 (Fla. 4th DCA 1986); Charles W. Ehrhardt, Florida Evidence § 704.1 (2006 ed.) ("An expert may express an opinion based on reasonable inferences that may be drawn from the evidence. The bar against building an inference on an inference is not applicable to preclude an expert's testimony based on reasonable inferences drawn from evidence."). This principal applies to ladders. *Parke v. Scotty's Inc.*, 584 So. 2d 621, 623 (Fla. 1st DCA 1991).

[9] Defendants' expert admits that some of the assumptions made in his analysis are based on William Long's impressions of the accident.

## II.      Strict Liability.

Under Florida law, strict liability actions are "based on the essential requirement that the responsible party is in the business of and gains profits from distributing or disposing of the 'product' in question through the stream of commerce." *Williams v. National Freight, Inc.*, 455 F.Supp.2d 1335, 1337 (M.D. Fla. 2006), citing *Johnson v. Supro Corp.*, 498 So. 2d 528, 529 (Fla. 3d DCA 1986).   The Florida Supreme Court has recognized that a strict liability theory may apply to manufacturers, as well as to others in the distribution chain, including retailers, wholesalers, and distributors.   *See id.*, citing *Samuel Friedland Family Enters. v. Amoroso*, 630 So. 1067, 1068 (Fla. 1994).   Under Florida law, a strict product liability action requires the plaintiff to prove that: (1) a product (2) produced by a manufacturer (3) was defective or created an unreasonably dangerous condition (4) that proximately caused (5) injury." *McCorvey v. Baxter Healthcare Corp.*, 298 F.3d 1253, 1257 (11th Cir. 2002), citing *Edward M. Chadbourne, Inc. v. Vaughn*, 491 So.2d 551, 553 (Fla. 1986).

A products liability plaintiff may establish a submissible case by either direct or circumstantial evidence, the latter frequently accomplished through the opinion testimony of an expert that the product was defective.   *See Cassisi v. Maytag Co.*, 396 So. 2d 1140, 1147 (Fla. 1st DCA 1981).   In cases where products have been either lost or destroyed, Florida's *Cassisi* inference provides that when a product malfunctions during normal use, a legal inference of product defectiveness arises, and the injured plaintiff thereby establishes a prima facie case for jury consideration.   *See Cassisi* at 1148, 1151.

Plaintiff's expert opined that: the wood rails were defective because they were either dried too long or at too high of a temperature; and the defect caused the left rail of the ladder to break suddenly resulting in Plaintiff's injuries. Such circumstantial evidence is sufficient to establish a submissible products liability case.

Defendants argue that Plaintiff is not entitled to the *Cassisi* inference since Plaintiff cannot personally recall how the ladder broke (as a result of his severe head injury) or offer the eyewitness testimony of another person as to the collapse/tip-over of the ladder (since Plaintiff was alone in the room). The Court agrees that Plaintiff is not entitled to a *Cassisi* inference in this case.

Thus, the Court finds that there is a material issue of fact as to whether the ladder was defective and sufficient evidence favoring Plaintiff's version of the facts for a reasonable jury to return a verdict in his favor. Accordingly, the Court denies summary judgment as to the issue of strict liability.

It is therefore ORDERED AND ADJUDGED that:

Defendants Louisville Ladder, Inc. and Wal-Mart Stores, Inc.'s Motion for Summary Judgment and Supporting Memorandum of Law (Dkt. #41) is **DENIED**.

**DONE** and **ORDERED** in Tampa, Florida on March 31, 2008.

JAMES S. MOODY, JR.
UNITED STATES DISTRICT JUDGE

**Copies furnished to:**
Counsel/Parties of Record

S:\Odd\2006\06-cv-2299.msj 41.wpd